|  | AUSA: Ryan A. Particka | Telephone: (313) 348-8178 |
|---|---|---|
| AO 91 (Rev. 11/11) Criminal Complaint | Task Force Officer: Jeffrey T. Whipple | Telephone: (586) 212-7802 |

# UNITED STATES DISTRICT COURT
for the
### Eastern District of Michigan

United States of America
v.

JORDAN ARMSTRONG

Case No.

Case: 2:21-mj-30035
Assigned To : Unassigned
Assign. Date : 1/19/2021
Description: RE: SEALED MATTER (EOB)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **October 2020** in the county of **Oakland County** in the **Eastern** District of **Michigan**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC § 1343 | Wire Fraud |
| 18 USC § 1029 | Fraud and Related Activity in Connection with Access Devices |
| 18 USC § 1028A | Aggravated Identity Theft |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
Complainant's signature

Jeffrey T. Whipple, Task Force Officer, FBI
Printed name and title

Sworn to before me and signed in my presence and/or by reliable electronic means.

Date: **January 19, 2021**

City and state: **Detroit, MI**

_____
Judge's signature

David R. Grand, U.S. Magistrate Judge
Printed name and title

## AFFIDAVIT IN SUPPORT OF A COMPLAINT

I, Jeffrey T. Whipple, Task Force Officer for the Federal Bureau of Investigation, being duly sworn, state as follows:

## INTRODUCTION AND AFFIANT BACKGROUND

1. I am currently a Patrol Officer with the Birmingham Police Department and have been employed with that department for 23 years. I am also currently an FBI Task Force Officer (TFO), assigned to the Oakland County Resident Agency of the Federal Bureau of Investigation, and have been so assigned since October of 2016. Specifically, I am assigned to the Detroit Metropolitan Identity Theft and Financial Crimes Task Force (DMIFT), led by the Federal Bureau of Investigation (FBI). My duties and responsibilities as a Task Force Officer include, but are not limited to, investigating violations of federal law, including Title 18, U.S.C. 1343 (Wire Fraud), Title 18, U.S.C. 1029 (Fraud and Related Activity in Connection with Access Devices), and Title 18, U.S.C 1028A (Aggravated Identity Theft) and have experience in the investigation, apprehension and prosecution of individuals involved in federal criminal offenses. I am empowered to conduct investigations of, and to make arrests for, offenses enumerated in Title 18 of the United States Code. At all times during the investigation described in this affidavit, I have been acting in an official capacity as an FBI TFO.

## PURPOSE OF AFFIDAVIT

2. This affidavit is made in support of a criminal complaint and arrest warrant for JORDAN VAUGHAN ARMSTRONG of violations of Title 18, U.S.C. §1343 (Wire Fraud); Title 18, U.S.C. §1029 (Fraud and Related Activity in Connection with Access Devices); and Title 18, U.S.C. §1028A (Aggravated Identity Theft).

3. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that ARMSTRONG, a resident of the Eastern District of Michigan, is responsible for knowingly possessing and using fraudulently-obtained access devices containing victims' unemployment insurance benefits to execute a scheme to defraud within the Eastern District of Michigan. Additionally, there is also probable cause to believe that this scheme required the use of interstate wire transactions to execute the fraud.

4. This affidavit is submitted for the limited purpose of securing a criminal complaint and arrest warrant; therefore, this affidavit does not contain every fact that I have learned during the course of the investigation, but rather only those sufficient to establish probable cause to believe that ARMSTRONG violated the statutes identified above. The information contained in this affidavit is based upon my personal knowledge, training and experience, as

well as the combined knowledge, training and experience of other law enforcement officers and agents with whom I have had discussions.

5. Title 18, U.S.C. § 1343 criminalizes the use of wire transmissions for the purpose of executing or attempting to execute any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.

6. Title 18, U.S.C. §1029(a)(2) criminalizes using one or more unauthorized access devices during any one-year period to obtain anything of value aggregating $1,000 or more. An access device is defined as any card, account number, personal identification number, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or other things of value, or can be used to initiate a transfer of funds. An unauthorized access device means any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud.

7. Title 18, U.S.C. §1028A criminalizes knowingly transferring, possessing, or using, without lawful authority, a means of identification of another person during the course of certain other felony violations, to include the above described wire fraud.

## BACKGROUND

8. This joint investigation conducted by the FBI, the Department of Labor-Office of Inspector General (DOL-OIG), and the Birmingham Police Department has revealed, as explained in more detail below, that JORDAN VAUGHAN ARMSTRONG, is executing a scheme to defraud by fraudulently obtaining unemployment insurance (UI) benefits issued by multiple states, to include Michigan, in various victims' names on prepaid debit cards and then using the cards to make cash withdrawals at Automated Teller Machines (ATM), causing an interstate wire transfer of funds. ARMSTRONG caused the prepaid benefit cards to be sent, via mail, to various residences in the Eastern District of Michigan. In addition, ARMSTRONG furthered the fraud by applying for and receiving UI benefits by means of using stolen social security numbers and other personal identifying information (PII) of victims provided in the application(s).

9. The Social Security Act of 1935 initiated the federal and state unemployment insurance system. The system provides benefits to individuals who are unemployed for reasons beyond their control. The purpose of the UI system is twofold: first, to lessen the effects of unemployment through cash payments made directly to laid-off workers, and second, to ensure that life necessities are met on a weekly basis while

the worker seeks employment. In The State of Michigan (SOM), the UI system is administered by the Unemployment Insurance Agency (UIA), which is part of the SOM's Department of Labor and Economic Opportunity (DLEO). Other States administer their UI programs through analogous state run agencies. Regardless of state, the U.S. Department of Labor funds each of the respective state agency's administrative costs surrounding UI, including salaries, office expenses, and computer equipment.

10. State unemployment systems and benefits are joint state and federal enterprises administered by the State Workforce Agency (SWA) of a given state and largely financed by taxes on private employers located in that state. When state unemployment benefits are exhausted, they may be supplemented by federal funds appropriated by the U.S. Department of Labor. As of the time of this application, the federal government is providing significant supplemental benefits to the states as a result of the COVID-19 pandemic.

11. The Families First Coronavirus Response Act (FFCRA) became law on March 18, 2020, and provided additional flexibility for state unemployment insurance agencies and additional administrative funding to respond to the COVID-19 pandemic. The Coronavirus Aid, Relief, and Economic Security (CARES) Act was later signed into law on March 27, 2020. The CARES act

5

further expanded states' ability to provide unemployment insurance for many workers impacted by the COVID-19 pandemic, including workers who are not ordinarily eligible for unemployment benefits. One such program established to accomplish that end was the Federal Pandemic Unemployment Compensation (FPUC) program. The FPUC allows eligible individuals who are collecting certain UI benefits, including regular unemployment compensation, to receive an additional $600 in federal benefits per week for weeks of unemployment ending on or before July 31, 2020. Another such program, the Pandemic Emergency Unemployment Compensation (PEUC) program, allows those who have exhausted benefits under regular unemployment compensation or other programs to receive up to 13 weeks of additional federally funded benefits up to December 26, 2020. On December 27, 2020, the President signed legislation that extended these programs for an additional 12 weeks. Those receiving unemployment benefits will be entitled to an additional $300 each week of unemployment until April 4, 2021. That is all to say, the recent federal legislation and programs detailed above allowed for a significant outlay of federal funds to flow to and through the states to offset the recent and historic need of the American workforce for unemployment benefits as a result of the COVID-19 pandemic, including the American workforce in the SOM and in the

Eastern District of Michigan (EDMI). Collectively and colloquially, the funds flowing from these programs have come to be known as Pandemic Unemployment Assistance (PUA).

12. Normally (in the absence of fraud), an unemployed worker initiates an unemployment claim (UI claim). This can be accomplished by submitting a claim in person, over the telephone, or on the Internet. Currently, the overwhelming majority of UI claims are filed online through a SWA website. In order to be eligible for UI benefits, the worker must demonstrate a certain level of earnings in several quarters immediately preceding the application. The amount of unemployment benefits that a UI claimant might be eligible for depends on a variety of factors, including but not limited to the length of his or her previous employment and the amount of wages he or she earned.

13. The SWA will either approve or reject a UI claim based on the application made by the unemployed worker. If the SWA approves a UI claim, the claimant is required to re-certify the claim via telephone or Internet at various times during the life of the claim. The worker must also certify that he or she is still unemployed and actively seeking work. One way in which unemployment benefits are provided to a claimant is through the use of a debit card, issued by the Bank of America (BOA) (in Michigan and

California), or US Bank (in Pennsylvania), which is mailed to the claimant through the U.S. Postal Service. The unemployment benefits are loaded onto the debit card electronically. Alternatively, a worker can provide the SWA with a bank routing number and bank account in which to have their unemployment benefits directly deposited electronically. In either case, additional benefits are loaded electronically at intervals thereafter.

14. In an effort to prevent and otherwise inhibit fraud, the SWAs capture certain data surrounding the interaction between an individual and the UI system. Each time a claim is accessed in the system, it creates a digital footprint of sorts. Although states utilize their own unique systems, many times the data that is collected includes the dates, times, Internet Protocol (IP) address, and Media Access Control (MAC) address associated with a device accessing a claim. The SWA systems tie this information to the user-entered information captured to facilitate the claim (i.e. name, address, social security number, BOA or other bank account numbers, bank routing numbers, etc.). It is through the analysis of this data that the SWAs and investigating agents can identify fraudulent trends and tendencies associated with certain claims.

15. US Bancorp is an American bank holding company based in Minneapolis, Minnesota, and incorporated in Delaware. US Bancorp is the parent company of US Bank.

8

16. Bank of America is an American bank and financial service holding company headquartered in Charlotte, North Carolina.

## PROBABLE CAUSE

17. In October 2020, a fraud investigator for Independent Bank in Michigan contacted the FBI to report ongoing suspicious activity. According to the bank investigator, an unidentified suspect (later identified by law enforcement as ARMSTRONG) had been making large, daily cash withdrawals at an Independent Bank Automated Teller Machine (ATM) in Farmington Hills, Michigan. At that time, ARMSTRONG was using twelve (12) prepaid debit cards, issued by either US Bank or Bank of America, to make the withdrawals, and was doing so daily using the Independent Bank drive-up ATM. Two of these cards commonly used by ARMSTRONG were a Bank of America card ending in 0574 and a US Bank card ending in 4672.

18. Independent Bank provided the FBI still photos taken from the closed-circuit television (CCTV) cameras located on the ATMs. ARMSTRONG was almost always observed driving a black Ford Explorer.

19. Through the use of facial recognition technology, the FBI was provided an investigative lead identifying ARMSTRONG as the possible subject of the photos provided by Independent Bank.

20. A search of the Michigan Secretary of State revealed a Ford Explorer, license plate EFK 9465, registered to ARMSTRONG at 30535 W 14 Mile Road, Apartment 4, Farmington Hills, Michigan. This address was located less than a mile from the Farmington Hills Independent Bank branch where the ATM withdrawals were being conducted. The photo appearing on ARMSTRONG's Michigan driver's license matched the CCTV photos of the subject provided by Independent Bank.

21. Federal Grand Jury Subpoenas issued in the Eastern District of Michigan to Bank of America and US Bank revealed the cards used by ARMSTRONG to make withdrawals were issued in the names of various individuals on behalf of the states of Pennsylvania, Michigan, and California for the purpose of receiving state and federal UI benefits. The total value of UI benefits loaded onto these cards used by ARMSTRONG was approximately $180,735. Additionally, there is substantial evidence that ARMSTRONG is responsible for the filing of numerous other fraudulent claims.

## VICTIM B.R.

22. Bank of America records revealed that eight of the twelve cards that had been identified as cards used by ARMSTRONG to make cash withdrawals, were cards that had been issued by Bank of America for the purpose of receiving California and Michigan UI benefit payouts. One of which was a

Michigan UI benefits card in the name of ARMSTRONG. The total amount of state and federal UI funds issued on these eight cards totaled approximately $157,890. Included in the four cards issued by the State of Pennsylvania was the card ending 0574.

23. According to records provided by Bank of America, the debit card ending in 0574, was issued in the name of a victim, herein known as B.R., a resident of Texas. Further, all wire deposits into the account (totaling $20,700), were from the State of California Employment Development Department and appeared to be the result of state and federal UI benefit payments. According to bank records provided by Bank of America, a debit card containing these UI benefits was ordered to be sent to a Detroit residence.

24. The Department of Labor provided records of the UI benefits claim filed using the name and social security number of B.R. in the State of California. The claim, filed on August 14, 2020, listed B.R.'s residential address as 360 Grand Ave, Oakland, CA 94610, which according to an open-source search is the address of a UPS Store.

25. The FBI contacted victim B.R., who stated that he/she never filed an UI benefits claim or given permission to anyone to file on his/her behalf in the State of California or anywhere else. B.R. had never lived in the State of California. B.R. was unfamiliar with both the California and Detroit

addresses listed on the application. Likewise, B.R. did not know anyone who lived in Michigan. B.R. verified that it was his/her correct social security number used to file the claim made in California.

26. According to bank records provided by Bank of America, the debit card in the name of B.R., ending in 0574, was used almost daily from September 30, 2020 to October 21, 2020 to make ATM withdrawals at the Farmington Hills Independent Bank Branch ATM, located in the Eastern District of Michigan. A total of approximately $20,692.40 was withdrawn from the account, resulting in a remaining balance of $7.60 on the card.

27. On October 21, 2020, the FBI conducted surveillance on ARMSTRONG's residence in Farmington Hills, Michigan. ARMSTRONG was observed wearing a black sweatshirt. ARMSTRONG departed his residence in the black Ford Explorer, Michigan license plate EFK 9465. ARMSTRONG traveled from his residence directly to the Independent Bank located at 32900 Middlebelt Road, Farmington Hills, Michigan, where he conducted ATM transactions from approximately 9:04 A.M. to 9:09 A.M. The ATM transactions were confirmed by the Independent Bank Investigator, who was virtually monitoring, via camera, the Farmington Hills Independent Bank branch. The Investigator was able to observe ARMSTRONG make multiple withdrawals using different debit cards. After departing that Independent

Bank branch, ARMSTRONG made one stop, briefly making a purchase from a nearby restaurant via the drive-thru window. ARMSTRONG then returned to his residence without making any other stops.

28. According to CCTV footage later provided by Independent Bank, at approximately 9:05 A.M. on October 21, 2020, a subject matching ARMSTRONG's description, wearing a black sweatshirt and driving a black SUV conducted multiple transactions at the drive-up ATM at the Independent Bank branch in Farmington Hills, Michigan. Consistent with this are the Bank of America records indicating that two $503.00 withdrawals were made on the card ending in 0574, for a total of $1,006.00 (ATM fees included), at approximately 9:06 A.M. and 9:07 A.M. on October 21, 2020 at the Farmington Hills Independent Bank branch.

## VICTIM E.J.

29. US Bank records revealed that four of the twelve cards that had been identified as cards used by ARMSTRONG to make cash withdrawals, were cards that had been issued by US Bank for the purpose of receiving Pennsylvania UI benefit payouts. The total amount of state and federal UI funds issued on these four cards totaled approximately $22,845. Included in the four cards issued by the State of Pennsylvania was the card ending 4672.

30. According to records provided by US Bank, the debit card ending in 4672, as referenced above, was issued in the name of a victim, herein known as E.J. Further, all deposits into the account were from the Pennsylvania Department of Treasury and were the result of state and federal UI benefit payments.

31. According to US Bank, debit card ending in 4672 was used daily from July 18, 2020 to July 23, 2020 to make cash withdrawals from the Farmington Hills Independent Bank ATM. One such transaction was a $500 withdrawal made on July 21, 2020 at approximately 4:41 P.M.

32. CCTV photos and ATM logs provided by Independent Bank also showed the debit card ending in 4672 being used at the Farmington Hills branch drive-up ATM to make a $500 cash withdrawal on July 21, 2020 at approximately 4:41 P.M. Photos taken from the ATM camera on July 21, 2020 at approximately 4:40 P.M. revealed a black Ford SUV pulling up to the ATM. An individual, matching ARMSTRONG's State of Michigan driver's license photo, conducted an ATM transaction and then the vehicle departed the vicinity of the ATM at approximately 4:43 P.M.

33. The FBI contacted victim E.J, who stated that he/she never filed an unemployment claim nor had anyone file on his/her behalf in the State of Pennsylvania or any other state. E.J., a resident of Arizona, had not lived in

14

the State of Pennsylvania. E.J. had been consistently employed as a pastor since the start of the pandemic and had no reason to file for unemployment benefits. E.J. had not received a debit card containing unemployment benefits and therefore had never made any cash withdrawals on any such debit card. E.J. verified that it was his/her correct social security number used to file the claim made in Pennsylvania.

34. The Department of Labor provided records pertaining to the UI claim filed using the name and social security number of E.J. in the State of Pennsylvania. The claim, filed on June 28, 2020, requested that benefit payments be issued via debit card and mailed to 16528 Mark Twain, Detroit, MI 48235. The phone number submitted on the application was a 313-area code phone number ending in 3399, which is an area code used in Wayne County, Michigan.

35. According to subscriber information provided by Sprint as a result of a federal grand jury subpoena, the phone number ending in 3399, as referenced above, was issued to ARMSTRONG from May 2020 until at least November 2020. The billing address listed for ARMSTRONG was 16537 Mark Twain, Detroit, MI.

36. According to quitclaim deeds filed with the Wayne County Register of Deeds, the property owner of both 16528 and 16537 Mark Twain St, Detroit,

15

Michigan, is SHUDRICKA TYLER (TYLER). According to records obtained from open-source searches, TYLER is associated with ARMSTRONG's 30535 W 14 Mile Road, Farmington Hills, MI apartment, where he has been found to be currently residing. Additionally, it was discovered that IP address 76.216.209.251 was registered to TYLER at 30535 W 14 Mile Road, Farmington Hills, MI. According to the Michigan Secretary of State, ARMSTRONG's legal address, which appears on his driver's license, is the 16537 Mark Twain address. Therefore, it is believed ARMSTRONG has direct access to each residence listed above through his personal relationship with TYLER.

## ADDITIONAL UNEMPLOYMENT CLAIMS

37. Through further investigations, the Department of Labor identified additional UI claims relative to addresses, phone numbers and IP addresses found to be associated with ARMSTRONG. According to these searches, approximately twenty-nine (29) other State of Michigan UI claims, nine (9) other State of Pennsylvania UI claims, and at least ten (10) other UI claims in various other states, were all made from the IP address 76.216.209.251, which, as referenced above, is an IP address registered to ARMSTRONG's current residence. The phone number ending in 3399, as referenced above as being registered to ARMSTRONG, appeared as the listed phone number

on approximately twenty-seven (27) UI claims filed in various names and states. The 16528 Mark Twain Street address, as referenced above as being associated with ARMSTRONG, appeared as the mailing address on approximately nineteen (19) UI claims filed in various names and states. These UI claims represent only a portion of claims believed to be associated with ARMSTRONG.

## **CONCLUSION**

38. Based on the investigation thus far, including the facts set forth above, your affiant submits that there is probable cause to believe that JORDAN VAUGHAN ARMSTRONG has executed a scheme to defraud, and while doing so knowingly possessed and used, without lawful authority, a means of identification of another person. In addition, your affiant submits that there is probable cause to believe that ARMSTRONG, within a one-year period, used one or more unauthorized access devices to obtain more than $1,000, and did so knowingly and with intent to defraud. There is also probable cause to believe that interstate wire transactions were used to execute the scheme to defraud.

39. Therefore, your affiant believes that probable cause exists that JORDAN ARMSTRONG violated Title 18, U.S.C. §1343 (Wire Fraud); Title 18, U.S.C. §1028A (Aggravated Identity Theft); and Title 18, U.S.C.

§1029(a)(2) (Fraud and Related Activity in Connection with Access Devices).

Respectfully submitted,

*[signature]*

Jeffrey T. Whipple
Task Force Officer
Federal Bureau of Investigation

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: January 19, 2021

*[signature]*

David R. Grand
United States Magistrate Judge

18